IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|   |   |   |
|---|---|---|
| NIAGARA TRANSFORMER CORPORATION | : | |
| | : | |
| v. | : | Civil Action No. DKC 11-3415 |
| | : | |
| BALDWIN TECHNOLOGIES, INC. | : | |
| | : | |

**MEMORANDUM OPINION**

Presently pending and ready for review in this breach of contract case is the motion for summary judgment filed by Plaintiff/Counter-Defendant Niagara Transformer Corporation ("Niagara"). (ECF No. 21). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, Niagara's motion will be granted.

**I.   Background**

**A.   Factual Background**

Except as otherwise noted, the following facts are undisputed. Defendant/Counter-Plaintiff Baldwin Technologies, Inc. ("BTI"), is a Maryland corporation that maintains its headquarters in College Park, Maryland. Niagara is a New York corporation with its principal offices in Buffalo, New York. In September 2004, the United States Government awarded BTI a delivery order to furnish and install a rotary uninterruptible power supply ("RUPS") system for Phase I of a project at the

National Institute of Standards and Technology ("NIST") in Boulder, Colorado. (ECF No. 22-5, Baldwin Aff. ¶ 5). The RUPS system functioned as a back-up source of power for NIST's campus in Boulder. (ECF No. 21-2, Ex. 2, Baldwin Dep. at 11).[1] Non-party SatCon Power Systems ("SatCon") served as a sub-contractor for BTI that, *inter alia*, supplied certain materials for Phase I of the project, including a RUPS unit (consisting of a generator, flywheel, and motor), as well as transformers, core

---

[1] The exhibits attached to Niagara's motion for summary judgment (ECF No. 21-2) are not accompanied by any authenticating affidavit or declaration. Until recently, this oversight may have precluded consideration of the documents at this stage. *See, e.g.*, *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993) (unsworn, unauthenticated documents cannot be considered on a motion for summary judgment). The 2010 amendments to Fed.R.Civ.P. 56(c)(2), however, "'eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated.'" *Brown v. Siemens Healthcare Diagnostics, Inc.*, No. DKC 11-0769, 2012 WL 3136457, at *6 (D.Md. July 31, 2012) (quoting *Akers v. Beal Bank*, 845 F.Supp.2d 238, 243 (D.D.C. 2012)). Instead of "a clear, bright-line rule ('all documents must be authenticated')," Rule 56(c)(2) now prescribes a "multi-step process by which a proponent may submit evidence, subject to objection by the opponent and an opportunity for the proponent to either authenticate the document or propose a method to doing so at trial." *Foreword Magazine, Inc. v. OverDrive, Inc.*, No. 10-cv-1144, 2011 WL 5169384, at *2 (W.D.Mich. Oct. 31, 2011). Importantly, "the objection [now] contemplated by the amended Rule is not that the material 'has not' been submitted in admissible form, but that it 'cannot' be." *Ridgell v. Astrue*, No. DKC 10-3280, 2012 WL 707008, at *9 (D.Md. Mar. 2, 2012) (quoting *Foreword Magazine,* 2011 WL 5169384, at *2). Here, BTI has not raised any objection to Niagara's exhibits. Accordingly, the exhibits will be considered as being what they purport to be.

reactors, and chokes. SatCon, in turn, obtained the transformers and core reactors from Niagara. (*Id.*).

In anticipation of Phase II of the project, BTI contacted SatCon in early 2006 to obtain a price quote for a second set of the materials SatCon supplied in Phase I. (ECF No. 21-1, Ex. 2, Baldwin Dep. at 20-21). On January 20, 2006, Niagara provided a quotation to SatCon ("the January Quotation") for (1) an isolation transformer, priced at $58,393.00; and (2) an iron core reactor, priced at $68,978.00. (ECF No. 22-6, at 1-2). The January Quotation states that shipment will occur "16-20 weeks after receipt of approved drawings." (*Id.* at 2). The January Quotation attached Niagara's General Terms and Conditions of Sale. (*Id.* at 3). Paragraph 2 of that document is titled "Terms of Payment" and states "[n]et cash within thirty (30) days from the date of shipment." (*Id.*). Paragraph 3 bars Niagara from being held liable "for delay in delivery due to causes beyond its reasonable control, including but not limited to, acts of God, . . . floods, . . . and inability due to causes beyond its reasonable control to obtain necessary labor, materials or manufacturing facilities, nor in for consequential damages." (*Id.*). Paragraph 4 is titled "Acceptance of Orders" and states that "[t]he Corporate Headquarters, located in Buffalo, New York, may only make acceptance of orders." (*Id.*). Paragraph 10 is titled "Finance

Charge" and provides that "[a]ll past due accounts subject to a service charge of 1 ½% per month (18% per annum)." (*Id.*).

According to Mark Baldwin, the CEO of BTI, SatCon forwarded the January Quotation to BTI. (ECF No. 21-2, Ex. 2, Baldwin Dep., at 27-28). On January 30, 2006, BTI provided the Government with a quotation for Phase II of the project. (ECF No. 22-5, Baldwin Decl. ¶ 12). According to Mr. Baldwin, this quotation included an estimated completion date for Phase II based on the delivery timeframe provided by Niagara in the January Quotation. (*Id.* ¶ 13).

Later in February, SatCon requested that BTI work directly with Niagara regarding the purchase of the equipment needed for Phase II. (ECF No. 21-2, Ex. 2, Baldwin Dep. at 24-25). On February 27, 2006, Niagara provided a quotation directly to BTI ("the February Quotation") for (1) an isolation transformer, priced at $58,393.00; and (2) an iron core reactor, priced at $68,978.00. (ECF No. 21-2, Ex. 3). The February Quotation states that shipment will occur "30 weeks after receipt of purchase order" and makes no mention of drawings. (*Id.*). Like the January Quotation, the February Quotation attached Niagara's General Terms and Conditions of Sales.

After the Government awarded BTI the delivery order for Phase II of the project, BTI sent a purchase order directly to Niagara on March 15, 2006. (ECF No. 21-1, Ex. 4). The purchase

order requests the following: (1) one "E-Switchgear," described as "Item #1 per attached letter dated January 20, 2006" at a rate of $58,393.00, plus $1,705.00 for freight; and (2) one "E-Switchgear," described as "Item #2 [per attached letter]," at a rate of $68,978.00, plus $1,705.00 for freight. (*Id.*). In the column titled "Expected," the purchase order states "7/5/2006." (*Id.*). The purchase order attached the January Quotation.

On March 16, 2006, Niagara sent a fax to BTI stating that "[w]e acknowledge and thank you for your Purchase Order 3775-1170" and that "[p]lease note per my February 27, 2006 quotation our delivery is out to 30 weeks A[fter] R[eceipt of] O[rder] for this equipment." (ECF No. 21-2, Ex. 5). On April 3, Niagara sent BTI an acknowledgement form, which lists an estimated ship date of October 13, 2006. (ECF No. 21-2, Ex. 6). Mr. Baldwin, however, does not recall receiving any indication that Niagara would be unable to meet a July delivery date until sometime later in April. (ECF No. 21-2, Ex. 2, Baldwin Dep. at 32-33). Mr. Baldwin avers that, in early April 2006, Niagara informed him that its "efforts were being diverted to supplying equipment in support of the Hurricane Katrina recovery efforts." (ECF No. 22-5, Baldwin Decl. ¶ 18). At that time, BTI revised its schedule for Phase II to account for an October delivery date and communicated a new estimated completion date of November 30 to the Government. (ECF No. 21-2, Ex. 2 Baldwin Dep. at 33-34).

On May 11, 2006, Niagara faxed BTI a copy of its credit application and included a cover page advising that that "it had not been able to improve from the October [delivery] date" but "would continue to expedite." (ECF No. 22-10, at 1). That same day, Mr. Baldwin, on behalf of BTI, signed and completed the credit application. (ECF No. 21-2, Ex. 7). Directly above his signature, the credit application states that "[c]ustomer agrees to pay reasonable collection and attorney costs for any past due amounts that are placed for collection." (*Id*. at 74).

In a letter dated November 6, 2006, Niagara advised BTI that the Buffalo area had received an early winter storm that caused extensive power outages and flooding. (ECF No. 21-2, Ex. 9). Niagara further advised that its plant was without power from October 12 through October 17 and that, even once its power was restored, many employees were unavailable to work. (*Id*.). Niagara explained that this situation, combined with "a very full schedule," meant that delivery of BTI's order "will be delayed to the end of November." (*Id*.). Niagara represented that "we are working around the clock to try and reduce this shipping delay as much as we can as quickly as we can." (*Id*.).

In a separate letter also dated November 6, 2006, Niagara advised that it had "been experiencing several delays on this project," including certain delays caused by the specialized core reactor's requirements. (ECF No. 21-2, Ex. 10). The

letter stated that "[p]resently we are looking at the third week of December for a ship date" and that "[we] will be happy to talk with your customer to reiterate that the order delay is due to production problems at [Niagara] and not the cause of [BTI]." (*Id.*). According to Mr. Baldwin, Niagara contacted BTI *via* telephone in late November 2006 to explain that it had experienced another setback because of a roof collapse in its manufacturing facility. (ECF No. 22-5, Baldwin Decl. ¶ 28). Mr. Baldwin also avers that, on November 22, 2006, Niagara informed BTI that the delivery date would be pushed back again to the third or fourth week of December. (*Id.* ¶ 29).

Mr. Baldwin represents that, during this time period, the Government repeatedly notified BTI that it was dissatisfied with "the missed delivery dates" and asked BTI for certain concessions. (ECF No. 22-5, Baldwin Decl. ¶ 31). BTI provided some of the requested concessions, at its own expense, including by designing new access doors and by relocating certain electrical equipment. (*Id.* ¶ 33).

Niagara ultimately shipped the equipment on December 18, 2006. BTI received the equipment on December 25, 2006, approximately forty-five (45) weeks after BTI submitted its purchase order. (ECF No. 21-2, Ex. 2, Baldwin Dep., at 137). At that time, work on Phase II of the project had stopped for the winter and would not resume until March 2007. BTI

eventually installed the Niagara equipment in April 2007. (*Id.* at 80-81). It is undisputed, however, that BTI has never paid Niagara's invoices, which total $130,781.00 and are dated December 18, 2006. (ECF No. 21-2, Ex. 11).

On September 7, 2007, the Government issued a "Notice of Termination for Cause" to BTI, ending BTI's work on the RUPS project. (ECF No. 21-2, Ex. 12). The Notice of Termination cites a variety of reasons for termination, including BTI's failure to meet either its original completion date or several revised completion dates. The Notice does not reference Niagara or Niagara's equipment. (*See id.*). Mr. Baldwin maintains, however, that but for Niagara's failure to deliver the equipment by October 2006, BTI would have completed Phase II by the end of 2006. (ECF No. 21-2, Ex. 2, Baldwin Dep., at 78). Mr. Baldwin also represents that, for the next three years, BTI had to disclose this termination on all of its bids for contracts with the Government, effectively making BTI ineligible to receive any such contracts and causing a significant loss in profits.[2]

---

[2] On September 4, 2008, BTI filed suit against the Government in the United State Court of Federal Claims, alleging that NIST improperly and unlawfully terminated its contract. (ECF No. 21-2, Ex. 8). According to Niagara, BTI later voluntarily dismissed its suit against the Government. (ECF No. 21-1, at 4).

### B.    Procedural Background

On November 28, 2011, Niagara filed suit against BTI in this court, asserting a single breach of contract count based on BTI's failure to pay the bargained-for price of $130,781.00 for the equipment delivered in December 2006.  (ECF No. 1).  On December 29, 2011, BTI filed an answer to the complaint and a counterclaim, asserting a breach of contract count based on its contention that Niagara's failure to deliver the equipment on time constituted a material breach of the parties' contract and proximately caused damages in an amount not less than $1,364,888.  (ECF No. 6).[3]  Following discovery, Niagara moved for summary judgment on both its breach of contract claim and BTI's counterclaim.  (ECF No. 21).  BTI filed an opposition (ECF No. 22), and Niagara replied (ECF No. 23).

## II.  Standard of Review

Summary judgment may be entered only if there is no genuine issue as to any material fact and the moving party is entitled

---

[3]  In its interrogatory responses, BTI explains that this figure represents the sum of the following amounts: (1) $706,000 in payment "held back" by NIST in connection with Phase II of the project; (2) $600,000 in lost profits resulting from the Government's rejection of BTI's bid for a "Bear Primary Power Units" contract; (3) $1,600 in legal fees paid to litigation counsel in this action; (4) $47,288 in legal fees paid to BTI's counsel in its lawsuit against the Government; and (5) $10,000 in accounting fees incurred in connection with a federal audit of the RUPS project.  (ECF No. 21-2, Ex. 14, at 9).

to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008). Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)). "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). At the same time, the facts that are presented must be construed in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

## III. Analysis

### A. Choice of Law

In its motion, Niagara contends that Article 2 of the Uniform Commercial Code ("the U.C.C."), as adopted by New York, governs the parties' claims because their contract was formed in New York and is one for the sale of goods. (ECF No. 21-1, at 6 n.3). In its opposition, BTI does not specifically address choice of law, but cites to both New York and Maryland law. (*See generally* ECF No. 22). For the reasons that follow, New York's U.C.C. will be applied.

Because subject matter jurisdiction in this case is premised upon diversity of citizenship, the conflict of law rules of Maryland, the forum state, apply. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497 (1941). Maryland's version of the U.C.C. contains the following choice of law provision that applies where, as here, the parties have not affirmatively agreed to application of a particular state's law:

> In the absence of an agreement effective under subsection (a) of this section, and except as provided in subsection (c) of this section, the Maryland Uniform Commercial Code applies to transactions bearing an appropriate relation to this State.

Md. Code Ann., Com. Law § 1-301(b).[4]

---

[4] None of the exceptions set forth in Subsection (c) to Section 1-301 apply here.

Although this provision would seem to counsel in favor of applying Maryland's version of the U.C.C. to the parties' dispute, this court has rejected a "restrictive, forum oriented interpretation" of the statute that would apply the law of the forum state even though another state might have a more "appropriate relation" to the transaction in question. *United Overseas Bank v. Veneers, Inc.* 375 F.Supp. 596, 601 (D.Md. 1974).[5]   The term "appropriate relation" is not defined in Section 1-301, but the Official Comment to the provision states that "the question [of] what relation is 'appropriate' is left to judicial decision" and is "not strictly bound by [choice of law] precedents established in other contexts."   Md. Code Ann., Com. Law § 1-301, cmt. 3.   Thus, as the Fourth Circuit observed in a case applying South Carolina's U.C.C., "[t]he majority of courts . . . has defined 'appropriate relation' in accord with the dominant trend in modern conflict of laws analysis, under which the law of the state with the 'most significant relationship' to the matter at issue is applied." *In re Merritt Dredging Co., Inc.*, 839 F.2d 203, 206 (4th Cir. 1988).

_____

[5] *Veneers* involved the interpretation of the predecessor to Section 1-301, which (prior to June 1, 2012) was codified at Section 1-105 of Maryland's Commercial Code. *See Veneers*, 375 F.Supp. at 600.   The Official Comment to Section 1-301 states that the provision "is substantively identical to former Section 1-105" and that "[c]hanges in language are stylistic only."   Md. Code Ann., Com. Law § 1-301, cmt. intro.

In both *Veneers* and *Merritt Dredging*, the court ultimately looked to the relevant section of the Restatement (Second) of Conflicts of Laws ("the Restatement") to determine which state had the most substantial relationship to the transaction in question. *See Veneers*, 375 F.Supp. at 601 (applying Section 216 of the Restatement to a dispute about a negotiable instrument); *Merritt Dredging*, 839 F.2d at 206-07 (applying Section 244 of the Restatement to a dispute involving the conveyance of an interest in chattel). Therefore, to determine which state's law applies to the instant dispute, it is appropriate to consider the factors set forth in Section 188 of the Restatement, which include the place of contracting, the place of negotiation, the place of performance, the location of the subject matter of the contract, and the domicile, residence, place of incorporation, and place of business of the parties. *See* Restatement (Second) of Conflicts of Laws § 188 (2012). These factors are to "be evaluated according to their relative importance with respect to the particular issue." *Id.*

Application of these non-exclusive factors here compels the conclusion that New York has the most significant relationship to the parties' dispute. Pursuant to Niagara's General Terms and Conditions of Sale, formation of the contract occurred upon Niagara's receipt of BTI's purchase order at its headquarters in Buffalo, New York. There is no clear evidence in the record

13

regarding where the parties negotiated the contract, rendering the second factor neutral.  As to the third factor, the primary place of performance for the contract was New York, where Niagara manufactured the equipment and to where BTI was supposed to remit payment.[6]  In addition, New York is also the place where the majority of the delays that are at issue took place, including those purportedly caused by the October 2006 weather events in the Buffalo area, the heavy workload at Niagara's Buffalo factory, the design complications associated with the reactor, and the roof collapse at Niagara's factory.  The final factor (*i.e.*, the location of the parties) is also neutral, as BTI is incorporated under Maryland law and maintains its headquarters in College Park, Maryland, while Niagara is a New York corporation with its principal offices in Buffalo, New York.  On balance, then, New York appears to have the most significant relationship with the transaction, meaning that Article 2 of New York's U.C.C. will be applied.

> **B.    Niagara's Claim for the Purchase Price and BTI's Counterclaim for Damages Caused by Delay**

In its motion, Niagara argues that it is entitled to judgment as a matter of law on its breach of contract claim because the undisputed facts show that BTI accepted delivery of

---

[6] Neither party argues that the laws of Colorado – the state where the equipment was ultimately delivered and used by BTI – should apply.

14

the equipment and therefore is obligated to pay the agreed-upon contract price. (ECF No. 21-1, at 5-6). Niagara further argues that BTI "is not entitled to any offset against the amount due" based on injuries allegedly caused by Niagara's delay in delivery because BTI never provided notice that it considered that delay to constitute a breach. (*Id.* at 6-7). As explained below, Niagara's arguments have merit and are dispositive of both its breach of contract claim and BTI's counterclaim for damages.

Generally, where a buyer accepts goods, a buyer must pay the full purchase price for those goods. N.Y. U.C.C. § 2-607(1); *see also Orbis Co. v. Rivera*, 529 N.Y.S.2d 104, 105 (N.Y.App.Div. 1988). To establish a *prima facie* claim for the purchase price of accepted goods, a seller must demonstrate the following: that it sold and delivered certain goods to the buyer at the buyer's request; that the goods were of reasonable value or agreed price; and that the buyer accepted the goods without paying, despite demand by the seller. *See, e.g., Boise Cascade Office Prods. Corp. v. Gilman & Ciocia, Inc.*, 816 N.Y.S.2d 374, 374 (N.Y.App.Div. 2006).

Here, the parties agree that they entered into a valid and binding contract, pursuant to which Niagara promised to manufacture and sell a transformer and reactor to BTI for the purchase price of $130,781.00. Although the parties dispute

whether that contract required delivery by July 2006 or by October 2006, their disagreement on this particular point is immaterial because it is undisputed that Niagara did not deliver the equipment until December 25, 2006, and therefore was untimely under either deadline. The record is also unequivocal that BTI accepted the untimely delivery and used Niagara's equipment until the Government terminated BTI from the RUPS project in September 2007. Despite its use of the equipment and despite receiving invoices from Niagara, BTI never paid any portion of the purchase price, nor the interest that began accruing on that amount on January 18, 2007 (*i.e.*, thirty (30) days after shipment) pursuant to Niagara's General Terms and Conditions of Sale. Accordingly, Niagara has met its *prima facie* burden of establishing BTI's liability for the agreed-upon purchase price of the equipment.

BTI maintains, however, that it is not liable for the purchase price and is itself entitled damages as a result of Niagara's untimely delivery, which BTI contends constituted a material breach of the parties' agreement. (*See* ECF No. 22, at 9-15). Under the U.C.C., "a buyer may defeat or diminish a seller's substantive action for goods sold and delivered by interposing a valid counterclaim for breach of the underlying sales agreement." *Created Gemstones v. Union Carbide Corp.*, 47 N.Y.2d 250, 255 (N.Y. 1979); *see also* N.Y. U.C.C. § 2-714

("Where the buyer has accepted goods and given notification (subsection (3) of Section 2-607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable."); *cf. id.* § 2-717 (allowing a buyer, under certain circumstances, to "deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract"). Where a buyer raises a viable counterclaim that the seller breached the underlying contract, the seller typically is not entitled to judgment on a goods sold-and-delivered theory until the competing counterclaim is resolved. *See, e.g.*, *Created Gemstones*, 47 N.Y.2d at 255; *Flick Lumber Co., Inc. v. Breton Indus., Inc.*, 636 N.Y.S.2d 169, 170 (N.Y.App.Div. 1996).

Importantly, however, a buyer who has accepted goods "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." N.Y. U.C.C. § 2-607(3). The notice given by the buyer "need only alert the seller that the transaction [was] troublesome"; no claim for damages or threat of future litigation need be included. *Computer Strategies v. Commodore Bus. Machs.*, 483 N.Y.S.2d 716, 723 (N.Y.App.Div. 1984) (citing U.C.C. § 2-607 cmt. 4); *see also In re Indesco Int'l, Inc.*, 451 B.R. 274, 305 (Bankr.S.D.N.Y. 2011) ("[T]he drafters of the UCC

did not intend a rigorous test to determine the sufficiency of notice; it can be oral as well as written, and it need not describe every objection to the transaction.") (internal quotation marks omitted).

A buyer who fails to comply with Section 2-607(3) is barred not only from "defending the seller's suit" based on the alleged breach but also from "maintaining an action to recover damages." 14 Williston on Contracts § 40:20 (4th ed. 2013); *see also* N.Y. U.C.C. § 2-714 cmt. 1 ("[t]he buyer's failure to notify of his claim under [Section 2-607(3)] . . . operates to bar his remedies under either" Section 2-714, which allows a buyer who has accepted goods to recover damages caused by the seller's breach, or Section 2-717, which allows a buyer to deduct damages caused by a breach from any part of the purchase price still owed). Thus, to defeat summary judgment where the seller has made out a *prima facie* case for non-payment of accepted goods, a buyer seeking damages either in the form of a setoff or *via* a counterclaim bears the burden of introducing "specific evidence" showing that the notice requirement has been satisfied. *See M. Slavin & Sons Ltd. v. Glatt Gourmet Cuisine, Inc.*, 877 N.Y.S.2d 857, 860 (N.Y.Sup.Ct. 2009).[7]

_____

[7] In its opening brief, Niagara's argument regarding notice is confined to Section II, titled "Niagara Is Entitled to Summary Judgment on its Breach of Contract Claim," and is not

In its opposition, BTI does not cite any specific evidence indicating that, following its acceptance of the equipment in December 2006, BTI ever notified Niagara that it considered the delivery delay to be a breach of the parties' contract. (*See* ECF No. 22-3, at 9-11). Instead, BTI maintains that the pre-acceptance history of communications between the parties demonstrates that Niagara was aware that its delay violated the parties' agreement and "at least implies that BTI had informed [Niagara] of the nonconformity." (*Id.*). Specifically, BTI cites the numerous letters and phone calls by Niagara in the fall of 2006 wherein Niagara notified BTI that delivery of the equipment would be delayed beyond October 2006. (*See id.*).

---

explicitly mentioned in the section addressing BTI's counterclaim. (*See* ECF No. 21-1, at 5-11). In its reply, Niagara clarifies that BTI's failure to provide notice bars BTI "from any remedy as a matter of law," including BTI's counterclaim for damages. (ECF No. 23, at 1-2; 9-10). As a general rule, "an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.,* 451 F.Supp.2d 731, 734 (D.Md. 2006). Courts do, however, have discretion to consider newly raised issues "in appropriate circumstances," including where "the counterarguments were addressed in the opposition." *Id.* Here, BTI had the opportunity to address both the factual underpinnings of Niagara's lack-of-notice argument as well as the legal significance thereof in its opposition. In light of this opportunity and the unambiguous language of Section 2-607(3)(a) barring a non-complying buyer from "any remedy," Niagara's arguments regarding notice will be considered as applying both to its breach of contract claim and BTI's counterclaim for damages.

Contrary to BTI's arguments, Niagara's knowledge of its delay simply is not relevant to determining whether BTI satisfied Section 2-607(3) under New York law. Among other purposes, the notice requirement established by Section 2-607(3) serves "not to inform the seller of his own act, but to reveal to him that the buyer chooses to assert the act as a breach and seek a legal remedy therefor." *Koenig Iron Works, Inc. v. Sterling Factories, Inc.*, No. 89-cv-4257, 1999 WL 178785, at *6 n.10 (S.D.N.Y. Mar. 30, 1999) (internal quotation marks omitted). As Judge Learned Hand explained in discussing a similar notice requirement in a precursor to New York's U.C.C.:

> The notice 'of the breach' required [by the statute] is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning.

*Am. Mfg. Co. v. U.S. Shipping Bd.*, 7 F.2d 565, 566 (2$^d$ Cir. 1925); *see also Aqualon Co. v. Mac Equip., Inc.*, 149 F.3d 262, 266 (4th Cir. 1998) (Virginia law) (explaining that notice is required even where a seller is aware the delivery is delayed because "'he does not know whether the buyer is willing to

accept deferred delivery as full satisfaction'" (quoting 5 Williston on Contracts § 714 (3$^{d}$ ed. 1961)).[8]

As this precedent illustrates, Niagara's knowledge of the fact of its delay is irrelevant for purposes of Section 2-607(3), as are any pre-acceptance expressions of dissatisfaction by BTI. What matters is whether BTI ever notified Niagara that, despite its acceptance of the untimely delivery, BTI still believed the transaction to be troublesome because of the delay. BTI points to no evidence indicating (let alone establishing) that such notification occurred in the months or years following its acceptance.

BTI did, of course, express its dissatisfaction with Niagara's delivery when it filed its answer and counterclaim in the instant lawsuit on December 29, 2011. Although BTI does not specifically argue that this filing satisfies Section 2-607(3)(a), there is a split of authority regarding whether a

---

[8] *But see Jay V. Zimmerman Co. v. Gen. Mills, Inc.*, 327 F.Supp. 1198, 1204 (E.D.Mo. 1971) (concluding that Section 2-607(3) does not apply in cases involving late delivery because "[i]t would be an unreasonable, if not absurd" to require a renewed notice of breach where "both the seller and the buyer are necessarily fully aware prior to tender that the seller's contract obligation to timely deliver has not been complied with"). As noted by the Fourth Circuit, "[b]oth previous and subsequent cases have rejected the reasoning of *Jay V. Zimmerman Co.*" *Aqualon*, 149 F.3d at 266 (citing *E. Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 971 (5th Cir. 1976); *Am. Mfg.*, 7 F.2d at 566; *Se. Steel Co. v. W.A. Hunt Constr. Co.*, 301 S.C. 140, 147 (S.C.Ct.App. 1990)).

buyer's complaint (or, as here, a buyer's assertion of a defense in response to a seller's lawsuit) can constitute notice. *Compare, e.g.*, *Lynx, Inc. v. Ordnance Prods., Inc.*, 273 Md. 1, 17 (1974) (because notice is a prerequisite to suit and an element of a buyer's cause of action, "the institution of an action by the buyer to recover damages cannot by itself be regarded as a notice of the breach contemplated under . . . [§] 2-607(3)") *with In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litg.*, 155 F.Supp.2d 1069, 1110 (S.D.Ind. 2001) (Tennessee and Michigan law) (concluding that "the filing of a complaint may be sufficient to satisfy the notice of breach requirement of § 2-607 under certain circumstances").

It does not appear that the New York Court of Appeals has specifically addressed the issue. In *Panda Capital Corp. v. Kopo International, Inc.*, the Appellate Division of the Supreme Court of New York seemingly embraced the view that a judicial complaint can satisfy Section 2-607(3)(a), observing that "the complaint and subsequent amended complaint in this action themselves constituted . . . notice." 662 N.Y.S.2d 584, 586-87. Significantly, however, the *Panda Capital* court also observed that the seller "had repeatedly made its objections to [the buyer's] pattern of performance" known prior to bringing suit. *Id.* at 587. Thus, *Panda Capital* cannot be read as establishing a *per se* rule that a judicial complaint or counterclaim, without

other forms of pre-suit notice, is always enough to create a triable issue of fact with respect to whether Section 607(3)(a) has been satisfied.

Even if BTI's pleading could constitute notice under Section 2-607(3)(a), however, it would nonetheless fail to satisfy the provision's timing requirement. Generally, whether a buyer notifies the seller of a breach "within a reasonable time" under Section 2-607(3) is a question of fact to be governed by a standard of reasonableness. *Cliffstar Corp. v. Elmar Indus. Inc.*, 678 N.Y.S.2d 222, 223 (N.Y.App.Div. 1998). In some circumstances, however, a buyer's delay in providing notice can be deemed unreasonable as a matter of law. *Sara Corp. v. Sainty Int'l Am. Inc.*, No. 05-cv-2944, 2008 WL 2944862, at *7 (S.D.N.Y. Aug. 1, 2008) (New York law). For example, a seller unreasonably delays in providing notice under Section 2-607(3) by waiting to complain about the buyer's late delivery of goods for more than eight months after accepting the untimely delivery and then doing so only in response to the seller's suit for payment. *Mount Vernon Mills, Inc. v. Murphy Textile Mills*, 539 N.Y.S.2d 334, 390 (N.Y.App.Div. 1989); *see also Sainty*, 2008 WL 2944862, at *8 (buyer's nine-month delay in registering a protest concerning the untimeliness of the shipment is "plainly unreasonable" given that "[t]he late delivery of the shipment is

not a latent defect such that [the buyer] could be excused for failing to discover the breach in a timely manner").

Here, more than five years elapsed between BTI's acceptance of the equipment and the filing of its counterclaim and answer. Other than arguing that Niagara was aware of the untimeliness of its delivery, BTI fails to offer any explanation for its own delay in providing the notification required by Section 2-607(3). Under such circumstances, a five-year delay is unreasonable as a matter of law.

Accordingly, because BTI fails to submit any specific evidence that creates a genuine issue of material fact as to whether it timely satisfied Section 2-607(3),[9] BTI is barred from

---

[9] Notably, in its sworn interrogatory responses, BTI identified John Darby, Niagara's President, as a person having information regarding (1) Niagara's refusal to grant the Government "a 25% price discount in consideration of Niagara's delivery delays" and (2) "his statement to Mark Baldwin, in or about the Fall of 2010, that 'I would rather help pay your legal costs in court than reduce my price.'" (ECF No. 21-2, Ex. 14, at 4). BTI does not cite to this interrogatory answer in arguing that triable issues of fact remain regarding whether BTI satisfied Section 2-607(3). (*See generally* ECF No. 22). Even if BTI had done so, however, it would not have been enough to defeat summary judgment for two reasons. First, any expression of dissatisfaction with Niagara's delivery by the Government is irrelevant to determining whether BTI, as the buyer, found the transaction to be troublesome post-acceptance – which, as discussed above, is the critical inquiry under Section 2-607(3). Second, although a buyer's post-acceptance request for a price reduction as a concession for a seller's delivery delay certainly could satisfy the flexible requirements for what constitutes notice under Section 2-607(3), waiting to make such a request until more than three years after acceptance would be

any remedies to which it otherwise might be entitled, including any offset of the purchase price or other damages caused by Niagara's delayed delivery.[10]    Thus, Niagara is entitled to judgment as a matter of law both on its breach of contract claim and on BTI's counterclaim.    Niagara will be awarded $130,781.00, representing the bargained-for purchase price of the equipment, plus interest in the amount of $150,724.21, in accordance with the its General Terms and Conditions of Sale (*i.e.*, 18% per annum interest on the principal amount of $130,781.00 from January 18, 2007, the date when payment was due, to today).

### C.    Niagara's Entitlement to Attorneys' Fees

Finally, Niagara also contends that it is entitled to an award of its reasonable attorneys' fees by virtue of the credit application signed by Mr. Baldwin on behalf of BTI.    (ECF No. 21-1, at 8 n.5).    Niagara represents that it will file a subsequent motion pursuant to Local Rule 109.2 seeking such fees.    (*Id.*).    BTI does not address Niagara's asserted

---

unreasonable as a matter of law pursuant to the New York precedent summarized above.    *See Mount Vernon Mills*, 539 N.Y.S.2d at 390 (eight-month delay unreasonable); *Sainty*, 2008 WL 2944862, at *8 (nine-month delay unreasonable).

[10] Accordingly, Niagara's alternative arguments – including that the provision regarding delay in Niagara's General Terms and Conditions bars recovery of consequential damages and that BTI has failed to offer sufficient proof to support its damages – will not be reached.

entitlement to attorneys' fees in its opposition. (*See generally* ECF No. 22).

New York follows the well-established "American Rule," meaning that a prevailing party is not typically entitled to an award of attorneys' fees absent an express agreement, statute, or court rule. *Hooper Assocs., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 491 (1989). In the case of an agreement, "the court should not infer a party's intention to waive the benefit of the rule unless the intention to do so is unmistakably clear from the language of the promise." *Id.* at 492. Whether a contract is ambiguous typically is a question of law to be determined by the court. *W.W.W. Assoc., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990).

Here, the provision relied upon by Niagara is the sentence in the credit application stating that "[c]ustomer agrees to pay reasonable collection and attorney costs for any past due amounts that are placed for collection." (ECF No. 21-2, Ex. 7, at 2). This provision unambiguously and unmistakably entitles Niagara to an award of reasonable attorneys' fees incurred in bringing and prosecuting this lawsuit, which was instituted to collect past due amounts owed by BTI to Niagara. Accordingly, Niagara will be directed to file a motion supporting the reasonableness of its requested attorneys' fees within fourteen (14) days and otherwise in accordance with Local Rule 109.2.

## IV.  Conclusion

For the foregoing reasons, the motion for summary judgment filed by Plaintiff/Counter-Defendant Niagara Transformer Corp. will be granted.  A separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge
